### RUGER et al. v. FIREMEN'S FUND INS. CO.

(District Court, S. D. New York. November 11, 1898.)

MARINE INSURANCE—COMMISSIONS ON CHARTER—CANCELING CLAUSE—NEGLI-GENCE.

A shipping broker, on November 18th, insured his commissions of $250 for obtaining a charter for the ship F., which was to proceed from London to Newport News and there load, with an option to the charterer to cancel if the vessel did not arrive by February 15th. On insuring no reference or inquiry was made as to a cancellation clause; but the defendant was in the habit of making such insurances, and by present usage such charters usually contain a cancellation clause. The vessel after remaining a month in London, while anchored in the Thames was injured by collision, and three weeks afterwards by a second collision. The injuries were not large and might have been repaired in time to reach Newport News within the charter period. No attempt was made to prepare her for the voyage, but the master remained in London to prosecute suits for the collisions, and in April went to Bremerhaven, the home port, and repaired for about $1,500. *Held* (1) that the defendants presumptively had knowledge of the current usage to insert in such charters a time and cancellation clause, and were presumed to insure against sea perils for the contemplated voyage to be made within the charter period, and not for a later voyage which would frustrate the purpose of the charter and would be commercially a different voyage from that contemplated in the charter or the policy; but (2) that the facts indicated the negligence of the ship in not repairing

earlier to Newport News, or attempting to make repairs to go there, as the proximate cause of the loss of the charter rather than sea perils; and that such negligence was not within the policy.

Cowen, Wing, Putnam & Burlingham, for libelant.

Butler, Notman, Joline & Mynderse and F. M. Brown, for respondent.

BROWN, District Judge. The above libel was filed to recover the commissions of a ship broker in obtaining a charter for the sailing ship Theodor Fischer, the commissions amounting to $250 having been insured by the defendant against loss by sea perils. The charter was dated November 17, 1896, and provided that the ship, being then in London, should repair to Newport News and there take on cargo, and that in case the vessel did not arrive at Newport News on or about February 15, 1897, the charterer should have the option of canceling or maintaining the charter. The ship had arrived in London on November 12th and discharged her cargo there afterwards. On December 12, 1896, while moored at the Greenwich buoys in ballast, she was damaged by collision with the steamship Trevarrock and beached. Some temporary repairs were made, and the master continued in London for the purpose of bringing suit against the Trevarrock. The suit was tried in April or May following. About the 1st of January while moored at the Deptford buoys she was run into by the Corsair, for which she recovered £150. The master says an estimate was made of the damage by the first collision, at £1,736, and by the second collision at £836. But this damage is not proved by any competent evidence, and the actual cost of repair at Bremerhaven was about $1,500. For greater economy in repairing there, and in order to prosecute the suits in London, the ship not being in condition then to be taken to Hamburg in winter, she remained in London until spring. On the 15th of February, the vessel not having arrived at Newport News, the charterer canceled the charter pursuant to its terms. The respondents contend that the plaintiff's loss of commissions was not through sea perils within the terms of the policy, but from the voluntary acts of the parties; namely, the acts of the owners in not repairing the ship in London, as might have been done, and in the voluntary canceling of the charter by the charterer. In July following the ship arrived in New York and was rechartered.

The insurance was effected without the issuing of a full policy of insurance, but by means of an acceptance of a written application. This application was made on the day following the signing of the charter, requesting "insurance of $250 on commissions on charter. Free of all average. Policy proof of interest. Valued at ———. Shipped on board ship Theodor Fischer. And to be insured at and from London to Newport News. Covering after arrival until vessel clears outward." A premium of 3 per cent. amounting to $7.50 was paid. In this application nothing was said in regard to the cancellation clause in the charter, nor was there any inquiry made by the insurers on that subject. In charter parties however such can-

cellation clauses are now usually inserted. Upon the acceptance of such applications, the testimony shows without doubt that the understanding is that the risks assumed by the insurers are the same as are assumed under the regular office policy. This covers sea perils, but does not cover delays, or mere damages for delay upon the voyage, not arising out of sea perils.

1. The subject of insurance in this case was the libelant's commissions, not the vessel. The printed form of the application makes its terms somewhat incongruous, as in the clause "shipped on board ship Theodor Fischer." The phrase "free of average," is not incompatible with an insurance of commissions, as sometimes only a part of the expected cargo might be loaded in consequence of sea perils. But if that phrase also were wholly incongruous, it could not change the subject insured from commissions to the vessel itself, contrary to the express language of the application and acceptance. The libelant had no interest in the vessel, while the commissions were wholly his. But as the commissions could only be earned by the loading of the ship at Newport News after a voyage from London, the libelant was interested in the completion of that voyage, that is, a voyage within the charter period, by which commissions might be earned; and the meaning of the insurance, in my judgment, is, that the ship should not be prevented by sea perils from making that voyage according to the terms of the charter and within the time fixed by the charter that was expressly referred to in the application, and which by current usage, defendant presumably knew to have a cancellation clause. Time is often essential in a mercantile adventure; and where there is a time condition, delay in entering upon a voyage beyond the time fixed, which would frustrate its purpose, would make it practically and commercially a different voyage or adventure from the one intended and contemplated, either in the charter, or in the policy. Jackson v. Insurance Co., L. R. 10 C. P. 125; Bensaude v. Insurance Co. [1897] 1 Q. B. 29, affirmed [1897] App. Cas. 609. In insuring therefore, upon a voyage agreed by charter to be made within fixed time limits, I think the insurers are bound by all the terms of the charter relating to the charterer's option in reference to the contemplated voyage, in so far as the ship's performance of the voyage contemplated is prevented by sea perils, unless excepted in the contract of insurance. The evidence shows that applications like the present are very common; that the defendant company often issued such insurance, and that the cancellation clause is now usual in charters; and the defendant must be presumed to be aware of it, contrary to the circumstances in Mercantile Steamship Co. v. Tyser, 7 Q. B. Div. 73. Had the defendants any wish to except themselves from the limitations of a cancellation clause, they were put upon inquiry by the reference to the charter in the application. See Gow, Marine Ins. p. 166.

It is unnecessary to consider the question as to the right of a charterer to cancel a charter for delay of the vessel in reaching her port of loading, where the charter contains no provision on this subject. A time limit fixed in the charter itself supersedes the need of any such inquiry. Such a limitation is presumptively an agreement by

the parties themselves that the purpose of the contract would be frustrated, or might be frustrated, by the vessel's delay in arrival beyond the time named, and if there should be any doubt on the subject, leaving the charterer to determine by the exercise of the option given him. When such an option is exercised in good faith, that ends the scope of the charter as respects the identity of the adventure or voyage. The possibility that a similar voyage may or might be made later, does not make it the same voyage or the voyage contemplated, either in the charter or in the contract of insurance. If, therefore, in the present case, the two collisions suffered in London, while the vessel was there, ought to be considered as the real and proximate cause of the failure of the vessel to arrive at Newport News by February 15th, inasmuch as those collisions were sea perils and defeated the voyage contemplated, I think the loss of the commissions should be deemed to be within the risks assumed by the defendant. In re Jamieson [1895] 2 Q. B. 90.

2. I am not satisfied, however, that those collisions ought to be considered as the true or proximate cause of the ship's failure to arrive at Newport News on February 15th. The vessel, as above stated, had arrived in London on the 12th of November. The first collision was not until the 12th of December. At that time she was unloaded, and was lying in the stream in ballast, and no reason appears why she had not already set sail for Newport News, as required by the charter.

3. The statement of the master that the damages caused by the two collisions, one on the 12th of December and the other about the 1st of January, were estimated respectively at £1,736 and £836, and were greater than the value of the vessel repaired, is entitled to no credit, in the absence of any testimony as to the cost of repair in England, and in view of his testimony that the repair of those damages subsequently made in Bremerhaven amounted to less than 6,000 marks or $1,500, making the vessel, after some other small outlay, worth from $10,000 to $12,000. After the first collision, no attempt was made to put the ship in condition to go to Newport News, and no legal excuse is given for not doing so. The master remained in London for the purpose of prosecuting the Trevarrock, in which he was finally defeated, on the ground that the Trevarrock was in charge of a pilot. For the second collision £150 damages were recovered, about half the whole subsequent cost of repair. No attempt at repair in London was made, it is said, because repairs could be procured cheaper at Bremerhaven; and so the ship remained in London for nearly four months. The conclusion seems to me unavoidable, that the ship failed to reach Newport News at the appointed time through negligently postponing her start from London, and through failure after the first collision to make any effort to repair for the purpose of fulfilling her charter obligations. Any such negligence, or the voluntary choice of the master or owners after a collision to abandon the charter and make no endeavor to fulfill it, though they might do so, simply because they may regard it as more to their interest to remain in port and prosecute suits, or to go to a different commercial country

for cheaper repairs, is not a sea peril, nor the necessary or natural consequence of a sea peril, and not therefore one of the risks assumed by the policy; and on that ground the libel, I think, must be dismissed.